IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TERRY GRAHAM, JR.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. **3:14-CV-4401-L** |
| **DALLAS AREA RAPID TRANSIT,** | § | |
| **JEANNE JONES, AND** | § | |
| **FERNANDO IBARRA, JR.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendants' Motion for Summary Judgment (Doc. 15), filed January 19,
2016. After considering the motion, response, reply, appendixes, record, and applicable law, and
for the reasons that follow, the court **grants in part** and **denies in part** Defendants' Motion for
Summary Judgment (Doc. 15).

## I.     Factual and Procedural Background[1]

This is a civil rights action arising out of an encounter between Plaintiff Terry Graham, Jr.
("Plaintiff" or "Graham") and two Dallas Area Rapid Transit ("DART") officers, Defendants
Fernando Ibarra, Jr. ("Ibarra") and Jeanne Jones ("Jones") (sometimes collectively, the "Officers").
On the afternoon of May 11, 2013, Graham left a shopping mall and boarded a DART bus in
downtown Dallas, Texas. Graham had not consumed any alcohol that day. While on the bus, he
witnessed a man in a gray shirt strike a woman at a bus stop and then run away from the bus toward
a McDonald's restaurant near the federal building in downtown Dallas.

---

[1] In its recitation of the facts, the court applies the legal standard set forth in Section II of this Memorandum
Opinion and Order.

At approximately 4:30 p.m. that same afternoon, Ibarra and Jones responded to a DART police dispatch regarding the assault Graham had witnessed. The dispatch reported that a black male had hit a female with an unknown object and thereafter may have boarded a DART bus. The dispatch described the suspect as wearing a gray shirt and blue jeans, although a later dispatch stated that the suspect may have changed his shirt. As Ibarra and Jones boarded the bus, they walked toward the back where Graham, wearing blue jeans and a light-colored shirt, was sitting. As the Officers approached Graham, Ibarra unholstered his department approved firearm and kept it at his side. He asked Graham for identification. In response, Graham stated: "I am not the guy you are looking for." Pl.'s Summ. J. App. 71. Graham did not use any profanities in response to Ibarra's questions. *Id.*[2] Other passengers on the bus also informed the Officers that Graham was not the individual who had committed the assault. *Id.*

Ibarra states that at this point in the encounter he noticed that Graham smelled like alcohol and observed that he had bloodshot eyes and slurred speech. Defs.' Summ. J. App. 26. Ibarra directed Graham to place his hands behind his back, and Jones handcuffed him. *Id.* at 18, 26. Ibarra removed Graham from the bus for further questioning. Officer Ibarra then advised Graham he was not a suspect in the assault but was "being arrested for public intoxication due to him being an

---

[2] According to Ibarra, when he asked Graham for identification, Graham responded with profanities, stating: "What the fuck man[.] I am a grown man. I don't have to give you shit[]" and "what the fuck man I ain't wearing no stupid ass gray shirt, I didn't hit the bitch, I saw it happen." *See* Defs.' Summ J. App. 26. Ibarra states that Graham then jumped up and continued to use profanities, becoming "visibly upset and disorderly." *Id.* In their motion for summary judgment, the Officers argue that Graham had been convicted of resisting arrest and failing to provide identification in the past, and that court information indicates he used profanities with officers in those instances. *See* Defs.' Summ. J. Br. 11 n.2. Graham's use of profanities in previous encounters with law enforcement is irrelevant to the court's analysis in this case. *Nothing in the record establishes that the Officers were aware at the time of their encounter with Graham that they knew he had been convicted of resisting arrest and failure to provide identification in the past.* Viewing all facts in the light most favorable to Graham, the nonmoving party, the court accepts, for purposes of its summary judgment analysis, his account that he did not use profanities in his encounter with Ibarra and Jones and only informed them that he was not the suspect in the assault.

**Memorandum Opinion and Order – Page 2**

obvious danger to himself and others." *Id.* at 19. Ibarra and Jones then escorted a handcuffed Graham toward a DART patrol car.

With respect to the ensuing events, the parties have provided the court with a videotape that appears to have been taken by a dash-mounted camera on another patrol car. *See id.* at 33; Pl.'s Summ. J. App. 70.[3] Each party represents to the court that the videotape supports his or her version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In *Scott v. Harris,* the Supreme Court reversed an Eleventh Circuit decision to uphold a denial of summary judgment where a videotape captured the events in dispute and the deposition testimony contradicted the videotape. "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.*

The court has viewed the videotape numerous times. Unlike the videotape in *Scott v. Harris*, unless the parties have an enhanced version of the videotape or specialized equipment for viewing the videotape that the court does not have, the court is unable to substantiate either party's version of the events that unfolded as the Officers led Graham toward the patrol car, except as herein described. The videotape is grainy, unclear, and an extremely bright glare on the lens obscures what transpires between the Officers and Graham. The audio portion is garbled and incomprehensible.

---

[3] Other than the videotape apparently taken from another patrol car, the parties have not provided the court with any other video or audio footage of the encounter. The evidence submitted by Defendants states that "Ibarra's Digital Recorder was damaged during the incident (screen broken and no power to the unit)." Defs.' Summ. J. App. 20.

The videotape, however, shows that Jones did not participate in the use of force as Graham was about to be put into the patrol car and during the ensuing struggle between him and Ibarra. The videotape clearly shows Jones standing by as Ibarra used force. Other than Jones's lack of participation, as the disputed events are too obfuscated to provide support for either the Officers' or Graham's version of the events, the videotape is of little utility to the court. Accordingly, the court will consider it only in assessing the lack of Jones's use of force during the struggle between Ibarra and Graham that occurred near the back door of the patrol car. Further, and as set out more fully below in its discussion of the parties' evidence, to the extent Defendants' retained and nonretained experts rely on their viewing of the videotape to support their opinions, the court will not consider this testimony, as it is inherently unreliable.

According to Defendants' version of the ensuing events, as Ibarra escorted Graham toward the back seat of the patrol car, Graham stepped onto the door sill and pushed back with force, causing him and Ibarra to lose balance and fall onto the concrete sidewalk. Graham kept kicking while on the sidewalk, striking Jones with his legs and injuring her, and biting Ibarra on the hand. Ibarra, believing Graham to be a danger to himself and others, deployed his Oleoresin Capsicum Spray ("OC Spray"). *See* Defs.' Summ. J. Br. 2. In support of their version, the Officers rely on their statements and incident reports, their deposition testimony, the report of Officer Roy Wilt with the Office of Professional Standards ("OPS"), the Affidavit of DART's Chief of Police James D. Spiller, the report of Defendants' retained expert, Albert Ortiz, and Graham's own deposition testimony admitting to repeatedly kicking his legs while he was on the sidewalk. Defs.' Summ. J. App. 3-17, 19, 21-22, 27-32, 34-36, 69-70, 124-25, 150, 193-204.

According to Graham's version, once near the patrol car, the Officers, without justification, slammed him to the ground, and severely beat, struck and injured him, even though he did not resist, hit, strike, attempt to flee, bite, or in any way pose a threat to the Officers. While Graham concedes he was kicking his legs after he was on the ground, he contends that Ibarra had his knee on Graham's neck, and provides evidence that his kicking "stem[s] from [him] flailing his legs as Ibarra choked the life out of him." Pl.'s Summ. J. Resp. Br. 9. In support of his version, Graham relies on the emergency room records from Parkland Hospital showing extensive facial injuries (Pl.'s Summ. J. App. 1-65), his own affidavit submitted in support of his response to the motion for summary judgment (*id.* at 71), as well as his deposition testimony where he states that Ibarra had his knee on his neck and he was kicking his legs because Ibarra "was choking the hell out of [him]." *Id.* at 75-76. In support of his contention that he never bit Ibarra, Graham points out that the incident report completed by Ibarra at 4:32 p.m. on May 11, 2013, shortly after the incident, does not list Ibarra as a victim or contain any reference to him being injured during the encounter with Graham. *Id.* at 68-69.

Dallas Emergency Medical Services ("EMS") was called to treat Graham for injuries at the scene, including for the effects of the OC Spray. Graham was then transported to the Dallas County Jail, but his injuries were severe enough that it would not accept him. Graham was then transported to Parkland Hospital for medical treatment of his injuries. The emergency room records show that in addition to burning eyes caused by the OC Spray, Graham suffered a two-centimeter laceration under his left eye, swelling of the left cheek, a left medial nasal fracture, bruising all over his face, and a small laceration to his inner lower lip. *Id.* at 7, 10. The emergency room records make no mention of alcohol, the smell of alcohol, or Graham's alleged intoxication. Once discharged the

following day, May 12, 2014, Graham was transported back to the Dallas County Jail where he was booked for assault of a public servant under cause number F13-16626. Defs.' Summ. J. App. 31-32.

On May 20, 2013, Graham filed a complaint with the DART Police Department's OPS against Ibarra for using excessive force during his arrest. Roy Wilt, who was assigned to the OPS, conducted an Internal Affairs investigation and found that DART Police policy violations were not committed and concluded that "Officer Ibarra used only the amount of force necessary." *Id.* at 8.

On November 1, 2013, a Dallas County Grand Jury indicted Graham for assault of a public servant in cause number F13-16626. Ultimately, cause number F13-16626 was dismissed by the Dallas County District Attorney's Office. The Officers did not testify before the grand jury on the felony charge against Graham.

On December 16, 2014, Graham brought this lawsuit against DART, Ibarra, and Jones, pursuant to 42 U.S.C. § 1983 for alleged violations of his First, Fourth, and Fifth Amendment rights.[4] Specifically, he brings claims against the Officers under the Fourth Amendment for "false arrest and/or false imprisonment," unlawful detention or seizure, and malicious prosecution. Compl. ¶¶ 24, 29-31. Graham also contends the Officers violated his Fourth Amendment rights by using

---

[4] Graham also asserts that he is seeking relief under "[t]he Civil Rights Act of 1871 (Ku Klux Klan Act), now codified as 42 U.S.C. § 1983[.]" *See* Compl. ¶ 19. The Ku Klux Klan Act of 1971 is codified at 42 U.S.C. § 1985(3) and "prohibits conspiracies to 'deprive . . . any person or class of persons the equal protection of the laws' and those aimed at preventing a person from lawfully voting." *Montoya v. FedEx Ground Package Sys. Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing 42 U.S.C. § 1985(3)). "'To state a cognizable claim under § 1985(3), [a plaintiff] must allege that (1) a racial or class-based discriminatory animus lay behind the conspiracy and (2) the conspiracy aimed to violate rights protected against private infringement.'" *Curley v. Gonzalez*, 2017 WL 4351073, at *4 (N.D. Tex. Sept. 30, 2017) (Lindsay, J.) (quoting *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 (5th Cir. 2001) (citations and footnote omitted)). Having reviewed the Complaint, in which Graham makes no allegations pertaining to section 1985(3), the court concludes his reference to the Klux Klan Act was an error. To the extent Graham intended to bring a claim for violations of section 1985(3), he fails to state a claim upon which relief may be granted. Specifically, he has not made any allegations that any Defendant conspired with anyone to deprive him of equal protection of the laws because of any class-based discriminatory animus, or to prevent him from lawfully voting. *See id.* Further, Graham offers no evidence to support a section 1985(3) claim. Accordingly, to the extent his reference to the Ku Klux Klan Act was not an error, this claim is **dismissed with prejudice** under Federal Rules of Civil Procedure 12(b)(6) and 56.

clearly excessive force after he was already handcuffed and under arrest, causing him bodily injury, and by failing to intervene to protect him from harm. *Id.* ¶¶ 21-23.[5] Although not entirely clear, in addition to the Fourth Amendment, Graham appears to be alleging that the Officers violated his First Amendment right to free speech in connection with their alleged use of excessive force, "in light of such force being in response to First Amendment speech alone[.]" *Id.* ¶ 21(a). Further, Graham sues Defendant DART pursuant to section 1983, alleging it has a custom, policy, or practice of allowing its officers to engage in excessive force and make arrests without probable cause, and that it failed to adequately train its officers in the use of force. *Id.* ¶¶ 26-27. In addition to his federal claims under section 1983, Graham brings state law tort claims against Ibarra and Jones for intentional infliction of emotional distress ("IIED"), false arrest and false imprisonment, and assault and battery. *Id.* ¶¶ 32-39. Graham seeks compensatory damages against Defendants, jointly and severally, punitive damages against the Officers, as well as attorney's fees, prejudgment and postjudgment interest, and costs.

## II.     Legal Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

---

[5] Plaintiff's Complaint is not a model of pellucid draftsmanship, and the court is unable to ascertain whether Plaintiff is alleging a claim for failure to intervene (sometimes referred to as "bystander liability") against one or both officers. The court, like Defendants, will assume his claim is against both officers.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136

F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.   Analysis

### A.   Section 1983 Claims Against DART

A governmental entity can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A governmental entity *cannot* be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Id*.; *see also Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979). DART has been recognized as a municipal entity subject to suit under 42 U.S.C. § 1983. *See Craig v. Dallas Area Rapid Transit*, 504 F. App'x 328, 334 (5th Cir. 2012); *see also Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 319-20 (5th Cir. 2001) (holding that DART is a municipal entity rather than an arm of the state).

For purposes of section 1983, official policy is defined as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by [DART's] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of [DART] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [DART] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of [DART] or to an official to whom that body had delegated policy-making authority.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*); *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*). A plaintiff must identify the policy, connect the policy to the governmental entity itself, and show that his injury was incurred because of the application of that specific policy. *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984). A plaintiff must establish that the governmental entity through its deliberate conduct was the "moving force behind the injury alleged" and must establish a direct causal link between the governmental entity's action and the deprivation of a federally protected right. *Bryan County v. Brown,* 520 U.S. at 404.

Liability must rest on official policy, meaning the governmental entity's policy, and not the policy of an individual official. *Bennett*, 728 F.2d at 769. The official complained of must possess

[f]inal authority to establish [DART] policy with respect to the action ordered. . . . The official must also be responsible for establishing final government policy respecting such activity before [DART] can be held liable. . . . [W]hether an official had final policymaking authority is a question of state law.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986). An employee, agency, or board of a governmental entity is not a policymaker unless the governmental entity, through its lawmakers, has delegated exclusive policymaking authority to that employee, agency, or board and *cannot* review

the action or decision of the employee, agency or board. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340-41 (5th Cir. 1989).

The policy or custom relied upon to establish liability may include the inaction of official policymakers but only when such inaction constitutes "deliberate indifference" to the rights of the plaintiff, and such indifference is a "closely related" cause of the plaintiff's injuries. *City of Canton v. Harris*, 489 U.S. 378, 388, 391 (1989). The failure or inaction regarding the discipline, supervision, or training of municipal employees "must amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton*, 489 U.S. at 390).

The type and quantum of proof a plaintiff must offer to establish deliberate indifference vary, however, with the type of inaction alleged and with the identity of the wrongdoer. When the wrongdoer is a policymaking official, a single act will suffice, if deliberate indifference and causation are established. *See, e.g.*, *Pembaur*, 475 U.S. at 481 ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."). When the challenge relates to a custom of behavior among nonpolicymaking employees, which may be contrary to official policy, the plaintiff cannot rely on a single instance of unconstitutional conduct, but must demonstrate "at least a pattern of similar incidents in which the citizens were injured . . . to establish the official policy requisite to municipal liability under section 1983." *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (internal quotations and citations omitted). Isolated violations are not persistent, often repeated constant violations that constitute custom or policy. *Bennett*, 728 F.2d at 768 n.3. In such "custom" cases, "where the violations are flagrant or severe, the fact finder will likely require a shorter pattern

of the conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation." *Id*. at 768.

Graham contends that DART is liable under section 1983 because it had a policy or custom that led to the alleged violations of his constitutional rights. He alleges DART "sanctioned the custom, practice and/or policy or procedure of illegal seizures, excessive force and/or violating [the] right[] to be free of unwanton [sic] seizure." Pl.'s Compl. § 26. According to Plaintiff's pleadings, "Ibarra and Jones's actions were a customary practice and/or policy or procedure that was sanctioned by DART" and such actions deprived him of his civil rights. Graham further alleges that, although assaults, beatings, and injury to citizens by DART police officers were not a policy or custom that was officially adopted by DART, the practice was so common and well-settled that it constitutes an official policy or custom, and DART had constructive knowledge of the "unspoken policy." *Id*. Graham also contends that DART is liable under section 1983 for its failure to adequately train its police officers.

In support of its motion for summary judgment, DART argues that it has adequate policies and procedures that ensure fair and humane treatment of all persons in its custody, as shown by the DART Police Department's Code of Conduct, which provides:

> All officers shall protect the rights of any person held in custody and no officer shall verbally abuse or use unnecessary force or violence against any such person.

> No officer shall willfully mistreat or give inhumane treatment to any person held in custody.

> Officers shall use only the reasonable amount of force necessary in effecting an arrest and maintaining custody of prisoners.

Defs.' Summ. J. App. 45-46.  DART contends that Graham has failed to come forward with any evidence or identify: "an official DART policy or custom"; a DART policymaker with final DART policymaking authority; or that the alleged official policy or custom of DART was the moving force of the alleged constitutional violations; or a pattern or practice of DART of constitutional violations sufficient to establish a persistent widespread practice of DART "that is so common and well settled as to constitute a custom that fairly represents governmental policy." Defs.' Summ. J. Br. 7.  In addition, DART contends there is no evidence that it sanctioned or ratified any policy or custom about which Graham complains.  Finally, DART contends that the evidence establishes that Ibarra and Jones meet the legal minimum training requirements for police officers in Texas, including successfully completing the Basic Peace Officer training requirements of the Texas Commission on Law Enforcement ("TCOLE"), and that Graham has failed to show that their training was inadequate.  *Id.* at 20 ("Graham has presented no evidence DART's training requirements for police officers fail to meet minimum state standards or that the training from the N. Central Texas Regional Police Academy was somehow deficient or inadequate and there is no genuine [dispute] of material fact on this claim." ).

The court recognizes that this litigation is at the summary judgment stage; however, before the court considers the summary judgment evidence, a plaintiff must have sufficiently pleaded a claim against a party.  Plaintiff's Complaint fails to allege sufficiently that a policy of custom of DART was a moving force behind his alleged injury, much less produce competent summary judgment evidence to establish that he was injured as a result of an unconstitutional policy of DART.  To defeat "a motion to dismiss, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts.'"

*Balle v. Nueces Cty., Tex.*, 690 F. App'x 847, 852 (5th Cir. 2017) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)). In other words, the pleadings are adequate with respect to a section 1983 claim against a municipality when they set forth "specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy of practice was the moving force" for the constitutional violation asserted. *Id.* (citation omitted). Graham has not even met this low pleading threshold, as his pleadings are entirely conclusory, which alone constitutes a basis for dismissal of his claims against DART.

In any event, in his response, Graham fails to address his section 1983 claim against DART, much less respond to any of DART's arguments in support of its motion for summary judgment. Although Graham's failure to respond to DART's arguments in support of summary judgment does not permit the court to enter a "default" summary judgment on his section 1983 claims against DART, the court is permitted to accept DART's evidence as undisputed. *Bookman v. Subzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.). Further, "a summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence." *Id.* (citing *Solo Serve Corp. v. Westowne Associates*, 929 F.2d 160, 165 (5th Cir. 1991)); *see also Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence."). As Graham's Complaint is not verified, the court may not consider it in determining whether he has raised a genuine dispute of material fact.

Having considered the summary judgment evidence provided by DART, and pursuant to Federal Rule of Civil Procedure 56(e), DART's motion for summary judgment must be granted because Graham has failed to provide even a scintilla of evidence to support his claims against

DART. By not responding to DART's arguments and submitting any evidence in support of his section 1983 claims against DART, Graham has failed to raise a genuine dispute of material fact as to DART's contentions and undisputed evidence supporting its motion for summary judgment, and DART is entitled to judgment as a matter of law. Accordingly, the court will grant DART's motion for summary judgment and enter judgment in DART's favor regarding Graham's section 1983 claims against it.

Alternatively, the court concludes that Graham has abandoned or waived his section 1983 claims against DART. When a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived[]") (citation omitted). As Graham failed to pursue his section 1983 claims against DART, they are no longer before the court, and he has abandoned or waived them. Accordingly, in addition to the reasons set forth previously, Graham's abandonment or waiver constitutes an alternative ground for granting summary judgment in DART's favor.[6]

### B. Claims Under Section 1983 Against Ibarra and Jones

Graham alleges Ibarra and Jones violated his right to be free from unreasonable seizure under the Fourth Amendment by: (i) unlawfully detaining him; (ii) arresting him without probable cause;

---

[6] To the extent Jones and Ibarra are sued in their official capacity, the court **dismisses** these claims as redundant of the claims against DART. *See generally Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as against the entity. It is not against the official personally, for the real party in interest is the entity.")).

(iii) using excessive and unreasonable force during his arrest; and (iv) maliciously prosecuting him for assault on a police officer.[7]

The Officers contend they are entitled to summary judgment based on qualified immunity with respect to these claims.[8]  In support, the Officers rely on the evidence submitted in the appendix to their motion, which includes the Affidavit of Albert Ortiz ("Ortiz Affidavit"), their retained expert, as well as his "Expert Opinion Report" ("expert report"), and the Affidavit of James Spiller ("Spiller Affidavit"), a nonretained expert.

Rule 702 of the Federal Rules of Evidence provides guidance on the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[7] Although not entirely clear, in addition to the Fourth Amendment, Graham makes an oblique reference to the First Amendment, alleging that the Officers' use of force was clearly excessive, "especially in light of such force being in response to First Amendment speech alone."  *See* Compl. ¶ 21(a).  The court recognizes the principle that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citation omitted).  "Courts need to be alert to arrests that are prompted by constitutionally protected speech, even when the arrestee's words are directed at a police officer performing official tasks. Trained officers must exercise restraint when confronted with a citizen's anger over police action." *Id.*  The court does not consider Graham's oblique reference to the First Amendment to rise to the level of a separate claim against the Officers for violating his right to free speech. In addition, he fails to even allege he engaged in any protected speech during the course of his arrest.  Further, he produces no evidence that he was detained or arrested for what he said.

[8] The Officers also contend that they are entitled to judgment on any claims asserted by Graham based on conspiracy and Fifth Amendment violations.  Graham's summary judgment response is silent as to these claims. Accordingly, assuming that he intended to assert claims based on conspiracy and violations of the Fifth Amendment, which is not entirely clear from the pleadings, they are deemed waived or abandoned, and are **dismissed with prejudice**. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002).  Further, the due process clause of the Fifth Amendment "applies only to violations of constitutional rights by the United States or federal actors." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000).  Graham has not alleged or established that the Officers were acting under federal authority.  Thus, it is clear that Graham cannot state an actionable Fifth Amendment claim against them, and this claim is, therefore, **dismissed with prejudice** on this basis as well.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Further, the Court clarified that the *Daubert* gatekeeping function applies to all forms of expert testimony, not just scientific. *Kuhmo Tire Company v. Carmichael* 526 U.S. 137, 141 (1998). The district court fulfills its role as gatekeeper by screening the proposed evidence and evaluating it in light of the specific circumstances of the case to ensure that it is reliable and sufficiently relevant to assist the jury in resolving the factual disputes. *Daubert,* 509 U.S. at 592-93.[9] The Fifth Circuit on more than one occasion has reminded district courts of their important gatekeeping functions. *See Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("Our point is that the ultimate issue in such cases can too easily become whatever an expert witness says it is, and trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the

---

[9] As numerous courts have recognized, while no party has raised any *Daubert* challenges, the court has authority to raise its concerns *sua sponte* to fulfill its unique gatekeeping function and ensure the integrity of the judicial process. *See, e.g.*, *Miller v. Barker Implement Co.*, 439 F.3d 407, 413 (8th Cir. 2006); *O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir. 1994).

trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").

As part of its obligation as a gatekeeper, prior to analyzing the parties' arguments on summary judgment, the court first addresses whether Ortiz's and Spillers's respective opinions meet the requirements for expert testimony under Rule 702, *Daubert*, and *Kuhmo Tire*.

## 1.    Expert Testimony

On November 4, 2015, Defendants filed their expert disclosures under Federal Rule of Civil Procedure 26(a)(2).  Defs.' FRCP 26(a)(2) Expert Disclosures (Doc. 14). Defendants listed Albert Ortiz, Police Consultant, as a retained expert, and stated that the subject of his testimony would be:

> on DART and the DART Police Department's policy and practice in reference to the investigation of criminal offenses, probable cause, arrest procedures, reasonable use of force, law enforcement training and how officers in the same or similar circumstances as Officer J. Jones and F. Ibarra could have reasonably acted and responded to the circumstances involving Graham.

Defs.' Expert Discl. 1.  Defendants also listed DART Police Chief James D. Spiller as a nonretained expert.  *Id.*

In support of their Motion for Summary Judgment, Defendants rely heavily on Ortiz's Affidavit and expert report.  *See* Defs.' Summ. J. App. 193-204.[10]  In his expert report, Ortiz opines, among other things, that: "[a]ny officer in the same or similar circumstances as Defendant Officers could reasonably believe probable cause existed to believe Graham was in violation of Texas Penal Code Section 42.01, Disorderly Conduct (Language)"; that "[a]ny officer in the same or similar

---

[10] In his Affidavit, Ortiz states he served as a police officer for approximately thirty-three years in the San Antonio (Texas) Police Department, and that he held every rank in the police department before retiring as the Chief of Police in 2006.  *Id.* at 193.

circumstances as Defendant Officers could reasonably believe probable cause existed to believe Graham was intoxicated in a public place and a danger to himself or others and the Officers could have acted in the same or similar manner as the Defendant Officers in taking him into custody[]"; that "the Defendant Officers' use of force was reasonable, necessary, and only the level of force necessary to accomplish a legitimate police objective and overcome Graham's violent resistance[]"; that "any officer in the same or similar circumstances as Officers Jones and Ibarra could reasonably believe that [his or her] use of force was reasonable, necessary, and only the level needed and could have acted in the same or similar manner as Officers Jones and Ibarra[]"; and that "the totality of the circumstances, including the video of the incident and the conduct of Graham, could lead any officer in the same or similar circumstances to believe probable cause existed to arrest Graham for Assault on a Public Servant[.]" Defs.' Summ. J. App. 201-04.

The court does not doubt that, as a former police chief, Ortiz would be qualified as an expert in the matters before the court. The court, however, questions the reliability and helpfulness of Ortiz's opinions with respect to the analysis of the Officers' motion for summary judgment based on qualified immunity. First, Ortiz does not take into account Graham's version of the events but instead assumes that the Officers' account is true. Otherwise stated, he accepts, *carte blanche*, the Officers' version of the facts while labeling Graham's version of the events as merely "allegations" or "claims," which implies his version is open to challenge, debate, or doubt. On summary judgment, however, the court must view all facts in the light most favorable to Graham, the nonmoving party. *Boudreaux*, 402 F.3d at 540. As Ortiz takes a one-sided approach, his opinions are of little utility to the court at this juncture.

Second, Ortiz's report is riddled with legal conclusions concerning probable cause and the use of force. He fails to preface his conclusions with the legal standards for probable cause and use of force. He does not address whether he had sufficient facts to reach his conclusions or discuss procedures or methodologies in the area of policing, including those employed in the course of making a lawful arrest or in determining whether the use of force was excessive on a continuum of force.

Third, Ortiz cites to the videotape submitted by DART as part of the basis for his opinions that the Officers' use of force was reasonable, necessary, and only the level of force necessary to accomplish a legitimate police objective and overcome Graham's resistance, and that any officer in the same or similar circumstances as Jones and Ibarra could reasonably believe that his or her use of force was reasonable, necessary, and only the level needed and could have acted in the same or similar manner as Jones and Ibarra. *See* Defs.' Summ. J. App. 203-04. As stated previously, absent an enhanced version of the videotape or special viewing equipment, neither of which the court has been provided, the videotape is too unclear to substantiate either party's version of the events, and is only helpful to the court insofar as it is able to see on the videotape that Jones did not participate in the use of force during Ibarra's arrest for public intoxication. Insofar as Ortiz's opinions are premised on the videotape, the court finds that they are inherently unreliable under Rule 702 and *Daubert*, and will not be considered in evaluating whether the Officers are entitled to summary judgment based on qualified immunity with respect to Graham's excessive force claim.

Spiller, in his Affidavit, holds many of the same opinions as does Ortiz with respect to the legality of the Officers' conduct. *See* Defs.' Summ. J. App. 34-37. Spiller's Affidavit, however,

suffers from many of the same problems as Ortiz's Affidavit and expert report. Like Ortiz, Spiller's opinions are premised on his acceptance of the Officers' version of the facts, and not Graham's. As already noted, this alone renders the opinion unreliable and unhelpful to the court when confronted with a factual dispute on summary judgment. Further, like Ortiz, Spiller cites to the videotape as a basis for his opinions regarding the legality of the Officers' conduct. *Id.* at 36-37. Once again, the videotape is too unclear to substantiate either side's account of the encounter, except for Jones's lack of participation in the scuffle. Any opinion formed from viewing the videotape is inherently unreliable and will not be considered by the court.

Finally, Ortiz and Spiller rely almost entirely on their years of experience as police officers to form their respective opinions. The advisory committee notes to the 2000 amendments to Rule 702 of the Federal Rules of Evidence ("Notes") state, "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony"; however, the Notes further provide:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed. R. Evid. 702 advisory committee's note, 2000 (citation omitted); *see also Pipitone v. Biomatrix*, 288 F.3d 239, 245-47 (5th Cir. 2012) (finding expert testimony reliable when the expert explained how his experience in the field led him to opine that an absence of contamination of some samples did not undermine his conclusion that the plaintiff's infection came from the same drug). Here, Ortiz

and Spiller are relying primarily, if not exclusively, on experience, to form their respective conclusions as to the legality of the Officers' actions, but each fails to articulate how that experience leads to his conclusion, why that experience is a sufficient basis for the conclusion reached, and how that experience is reliably applied to the facts of the case.

In short, the court determines that Defendants have not met their burden of showing that Ortiz's or Spiller's expert testimony is reliable and relevant under Rule 702, *Daubert*, *supra*, and *Kuhmo Tire, supra*, insofar as it is being offered to opine as to the legality and appropriateness of the Officers' conduct in detaining and arresting Graham, and the use of force against him by Ibarra. The court, therefore, will not consider their opinions and conclusions in this regard with respect to analyzing the factual disputes presented.

## 2. Qualified Immunity Standard

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A defendant official must affirmatively plead the defense of qualified immunity. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Defendants Jones and Ibarra have asserted this defense. *See* Defs.' Ans. 5, ¶ 4 (Doc. 6).

In deciding a dispositive motion that raises the defense of qualified immunity, the Supreme Court initially set forth a mandatory two-part inquiry for determining whether a government official was entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under *Saucier*, a court must determine first whether the facts alleged or shown are sufficient to make out a violation

of a constitutional or federal statutory right. If the record sets forth or establishes no violation, no further inquiry is necessary. On the other hand, if the plaintiff sufficiently pleads or establishes that a violation could be made out, the court must determine whether the right at issue was clearly established at the time of the government official's alleged misconduct. *Id.* The Court relaxed this mandatory sequence in *Pearson v. Callahan*, 555 U.S. 223 (2009), and stated, "[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory," and judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The second prong of the test "is better understood as two separate inquiries: whether the allegedly violated constitutional right[] [was] clearly established at the time of the incident; and if so, whether the conduct of the defendant[] [official] was objectively unreasonable in light of that then clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (internal quotation marks and citations omitted)); *see also Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999); *Hare v. City of Corinth,* 135 F.3d 320, 326 (5th Cir. 1998); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995).

Ordinarily, one who pleads an affirmative defense must establish his entitlement to such defense. In the context of qualified immunity, however, this burden varies from the norm. In this circuit, the rule is as follows:

> Where . . . [a] defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official

> demonstrate that he did not violate clearly established federal rights; our precedent
> places that burden upon plaintiffs.

*Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (internal quotations and citations omitted); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. at 640; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998); and *Pierce v. Smith*, 117 F.3d at 871.

In *Anderson*, 483 U.S. at 641, the Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster*, 28

F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640. For an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances.*" *Pierce v. Smith*, 117 F.3d at 882 (emphasis in original and citation omitted); and *Stefanoff v. Hays County*, 154 F.3d at 525. Stated differently, while the law does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 536 U.S. 731, 741 (2011) (citations omitted).

In analyzing qualified immunity claims, the Supreme Court has "repeatedly told courts … to not define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). Pursuant to *Mullenix*, courts must consider "whether the violative nature of *particular* conduct is clearly established" and must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotations marks omitted).

### 3. Unlawful Detention and False Arrest Claims

Graham contends that, in violation of his Fourth Amendment rights, the Officers unlawfully detained him and subsequently arrested him on charges of public intoxication and assault on a peace

officer without probable cause to believe that he committed a crime.[11]   The Officers move for

summary judgment based on qualified immunity.

*a.      Unlawful Detention*

The Fourth Amendment provides, in part: "The right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated

. . . ." U.S. Const. amend. IV.   "When [] officers detain[] [an individual] for the purpose of requiring

him to identify himself , they perform[] a seizure of the person subject to the Fourth Amendment."

*Brown v. Texas*, 443 U.S. 47, 51 (1979).   Under the Fourth Amendment, "[p]olice officers may

briefly detain individuals on the street, even though there is no probable cause to arrest them, if they

have a reasonable suspicion that criminal activity is afoot." *United States v. Michelletti*, 13 F.3d 838,

840 (5th Cir. 1994).   Reasonable suspicion exists if there are "specific and articulable facts which,

taken together with rational inferences from those facts, reasonably warrant [a detention]." *Terry*

*v. Ohio*, 392 U.S. 1, 21 (1968).   Whether reasonable suspicion exists is an objective inquiry that

turns on whether "the circumstances, viewed objectively, justify [the challenged] action." *Al-Kidd*,

563 U.S. at 735 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).   Thus, "[t]he Fourth

Amendment requires only some minimum level of objective justification for the officers'

actions—but more than a hunch—measured in light of the totality of the circumstances, considering

the facts available to the officer at the time of the detention."  *Allen v. Cisneros*, 815 F.3d 239, 245

(5th Cir. 2016) (per curiam) (citations omitted).

---

[11] In his Complaint and response brief, Graham at times states that he was detained *and* arrested for disorderly
conduct.  Although the Officers argue that they had probable cause "to believe Graham had committed the offenses of
disorderly conduct and public intoxication[,]" (Defs.' Summ. J. Resp. Br. 11),  the summary judgment record reveals
that while the Officers detained Graham for disorderly conduct, they never arrested him for disorderly conduct.  *See*
Defs.' Summ. J. App. 63-65.

Having considered the evidence in the light most favorable to Graham, the nonmoving party, as set forth directly below, the court determines that while the Officers are entitled to qualified immunity for initially stopping Graham and requesting identification, the summary judgment record is sufficient to raise a genuine dispute of material fact as to the Officers' entitlement to qualified immunity for subsequently detaining him for disorderly conduct after they informed him he was no longer a suspect in the assault.

### i.    The Initial Stop

Jones and Ibarra are entitled to qualified immunity for their decision to stop Graham and question him if a reasonable officer could have had a "reasonable suspicion, based on objective facts, that [he was] involved in criminal activity." *Brown*, 443 U.S. at 51. The Officers' deposition testimony on this issue is consistent. They testified that, while on duty, they learned from a DART dispatch that a black male, wearing blue jeans and a gray shirt, had assaulted a woman at a DART bus stop in downtown Dallas. A subsequent DART dispatch advised that the suspect may have changed from a gray to white shirt. According to the dispatch, the suspect, after committing the assault, may have boarded a bus coming out of downtown Dallas, Texas, from the West Transfer Center. Jones arrived first on the scene, and, after Ibarra arrived, the Officers boarded the bus. According to Ibarra, who took the lead, Graham was the only person that matched the general description of the suspect described in the dispatch because all of the other passengers were wearing bright-colored clothing, not a gray or white shirt and jeans like Graham. Given that Graham was the only passenger who matched the general description of the suspect in the dispatch and was on the same DART bus as the one on which the suspect was last seen and could possibly still be located,

the court determines that reasonable officers could agree that Jones and Ibarra had a reasonable suspicion that Graham was the suspect described in the DART dispatches and might have been involved in the aggravated assault. Graham's protestations of innocence and other passengers' attempts to tell the Officers that Graham was not the assailant do not make the Officers' conduct, in briefly detaining him, asking him for identification, and questioning him for the purpose of determining whether he committed the reported assault, any less reasonable. Thus, even assuming that Graham's rendition of the facts is true, Ibarra and Jones are still entitled to qualified immunity for the initial stop of Graham and request for his identification.

Moreover, even though Jones and Ibarra were mistaken about their suspicions and ultimately ruled out Graham as a suspect in the assault, the qualified immunity standard allows for such mistakes by law enforcement officials: "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations and citations omitted). Taking into account all of the circumstances, Jones's and Ibarra's conduct in detaining Graham to determine whether he was involved in the aggravated assault was not plainly incompetent; nor is there evidence that they knowingly violated the law. *See id.* Because a reasonable officer in their position could have believed that there was reasonable cause or suspicion to believe, initially, that Graham was the suspect involved in an assault, they are entitled to qualified immunity as to Graham's unlawful detention claim insofar as the initial encounter.

*ii.*    *Detention for Disorderly Conduct*

Under the Texas Penal Code, a person commits the offense of disorderly conduct if he intentionally or knowingly "uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace."  Tex. Penal Code Ann. § 42.01 (West 2016).  Texas courts interpret "breach of peace" as an act that "disturbs or threatens to disturb the tranquility enjoyed by the citizens."  *Ross v. State of Texas*, 802 S.W.2d 308, 315 (Tex. App.—Dallas 1990, no pet.) (quoting *Woods v. State of Texas*, 213 S.W.2d 685, 687 (Tex. 1948)).

Graham contends that the Officers' decision to detain him for disorderly conduct after they had already informed him he was not a suspect in the assault constituted an unlawful seizure in violation of his Fourth Amendment rights. The Officers move for summary judgment based on qualified immunity, arguing that after Graham failed to provide identification and began using profanities in response to Ibarra's questioning, it was reasonable for the Officers to conclude that Graham had committed the offense of disorderly conduct.  *See* Defs.' Summ. J. Br. 11.  In support, the Officers rely on Ibarra's incident report in which he states that in response to police questioning and requests for identification, Graham stated: "what the fuck man I am grown man I don't have to give you shit," and that Graham then jumped up and continued to use profanities, becoming "visibly upset and disorderly," stating, "what the fuck bro I heard the description [and] I aint wearing no stupid ass gray shirt, I didn't hit that bitch, I saw it happen[.]" *See* Defs.' Summ. J. App. 26.  In his deposition, Ibarra also testified that Graham used profanities in response to police questioning. *See id.* at 66-67. 100.

In response to the Officers' motion for summary judgment, Graham has provided an affidavit in which he testifies that Ibarra and Jones boarded the DART bus and "came straight at [him] with their pistols drawn and began harassing [him]." He further testifies:

> At that point all I did was tell them that "I am not the guy you are looking for." Other people on the bus told them the same thing that "he's not the guy." I did not use any profanity. I had not had any alcohol. It was a Saturday afternoon and I had been to the mall. I was completely sober and minding my own business.

Pl.'s Summ. J. App. 71. In his deposition testimony, Graham admits he was raising his voice in response to Ibarra's questioning. Defs.' Summ. J. App. 146.

As previously stated by the court, on a motion for summary judgment, the court must view all facts in the light most favorable to Graham, the nonmoving party. Thus, for purposes of determining whether the Officers are entitled to qualified immunity at the summary judgment phase of the case, the court must accept Graham's affidavit testimony as true.

Taking into account all of the circumstances, and viewing them in the light most favorable to Graham, the court concludes that Graham's affidavit testimony that he informed the Officers he was not the suspect in the assault but did not use profanities is evidence sufficient to raise a genuine dispute of material fact as to the Officers' entitlement to summary judgment based on qualified immunity. Absent any use of profanities by Graham, no reasonable officers in their position could have believed that there was reasonable cause to believe Graham was engaging in disorderly conduct in violation of section 42.01(a)(1) of the Texas Penal Code. Further, even if he did use profanity, there is no evidence that other passengers became alarmed, that their tranquility was disturbed, or that the very utterance of the profanities incited an immediate breach of the peace, which would

support the reasonableness of the Officers' conclusion that Graham breached the peace under Texas Penal Code, section 42.01(a)(1).

Accordingly, the Officers are not entitled to summary judgment based on qualified immunity as to Graham's unlawful detention claim regarding disorderly conduct, and their motion for summary judgment on this claim will be denied.[12]

### b.    False Arrest

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment [when] there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his [or her] presence, he [or she] may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). To prevail on a Fourth Amendment claim for "false arrest" brought under section 1983 when an officer asserts qualified immunity, a plaintiff must show that Officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime. Thus, probable cause is a necessary

---

[12] The court recognizes that the qualified immunity standard allows for mistakes by law enforcement officials: "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations and citations omitted). In this case, however, the issue is not whether the Officers made a mistake. Rather, the record on summary judgment simply does not support the Officers' version of the events that transpired on the bus in light of the disputed testimony, and the court may not make credibility assessments at the summary judgment stage. *Reeves*, 530 U.S. at 150.

component of Graham's Fourth Amendment claim for false arrest. *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010).

"Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006). When "facts supporting an arrest are placed before an independent intermediary such as a . . . grand jury, the intermediary's decision breaks the chain of causation" for false arrest, insulating the initiating party. *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004) (quoting *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994), *overruled on other grounds by Castellano v. Fragazo*, 352 F.3d 939, 949 (5th Cir. 2003)). A grand jury indictment establishes probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975). The chain of causation, however, "remains intact if it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant." *Cuadra*, 626 F.3d at 813 (citation omitted). "[T]he chain of causation is broken only whe[n] all the facts are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Id.*

Here, Graham was charged with public intoxication and, subsequently, with assault against a public servant, and a grand jury indicted him for the felony assault charge. He alleges that his Fourth Amendment rights were violated because the Officers lacked probable cause to arrest him for either offense. For the reasons that follow, the court determines that while the Officers are entitled to summary judgment based on qualified immunity with respect to Graham's false arrest claim for

assault on a police officer, genuine disputes of material fact remain with respect to his false arrest claim on the charge of public intoxication, and the Officers are not entitled to summary judgment on this claim.

<em>i. Arrest for Public Intoxication</em>

Ibarra and Jones contend that Graham's claim for false arrest based on the charge of public intoxication fails because probable cause existed to arrest him for public intoxication. Because Graham exhibited signs of public intoxication in their presence (including that he smelled like alcohol, had bloodshot eyes, and slurred speech), and because they believed he presented a danger to himself and others, the Officers argue that probable cause existed to arrest him for public intoxication. Graham contends that no probable cause existed to arrest him for public intoxication because he has provided evidence, including his affidavit and hospital records, showing he had nothing to drink and was sober on the day he was arrested and that there had been no reports that day that he was intoxicated. Graham contends that, even accepting as true Ibarra's and Jones's version of events that he smelled of alcohol, had slurred speech, and blood shot eyes, probable cause for his arrest was lacking because such facts do constitute public intoxication under section 49.04 of the Texas Penal Code absent evidence that he was so intoxicated that he posed a danger to himself or others.

Under Texas law, a person commits the offense of public intoxication if he "appears in a public place while intoxicated to the degree that [he] may endanger [himself] or another." Tex. Pen. Code § 49.02 (West 2011). "Intoxicated" means that a person does not have "the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug,

a dangerous drug, a combination of two or more of those substances, or any other substance in the body." *Id.* § 14.01.

The Officers state that they arrested Graham because he smelled like alcohol, had bloodshot eyes, and slurred his speech, and they believed he might be a danger, or potential danger, to himself or others. Having considered the summary judgment record, and viewing all evidence in the light most favorable to Graham, the nonmoving party, the court determines that no officer of reasonable competence could have believed he or she had probable cause to arrest Graham for public intoxication. First, the Officers' summary judgment evidence on this issue is replete with inconsistencies. The court has reviewed the Incident Report, dated May 11, 2013, the day of the incident. The Incident Report, signed by Ibarra, contains no mention that Graham was under the influence of alcohol or drugs, even though the form contains a section for an officer to indicate that the offender used alcohol or drugs. *See* Defs.' Summ. J. App. 24-25 (Incident Report). The Incident Report here shows that Ibarra shaded in the box that said "Not Applicable." *Id.* at 24. Further, in the Use of Force Supplement, which is undated, there is no mention of Graham being under the influence of alcohol or drugs, even though a separate section is provided on the form for this information. *See id.* at 23 (Use of Force Supplement). It is only in an undated supplement that Ibarra states Graham smelled like alcohol. *See id.* at 26 (Confidential Supplement). Second, the court has reviewed the copious and detailed hospital records submitted by Graham indicating he was, among other things, given morphine and that a CT Scan was conducted. *See* Pl.'s Summ. J. App. 1-65. These records contain no indication that Graham was under the influence of alcohol or drugs.

Finally, Graham has provided affidavit testimony that he "had not had any alcohol . . . [and] was completely sober." *Id.* at 71.

While the court recognizes that police officers need discretion to perform their jobs and does not lightly second-guess officers who must act on the spur of the moment, based on this record, and the inconsistencies in the Officers' own summary judgment appendix, the court cannot say that the Officers had a basis to believe with a "fair probability" that the offense of public intoxication had been committed, nor can the court conclude that the Officers' conduct was objectively reasonable.[13] The court, therefore, determines that genuine disputes of material fact exist as to whether probable cause was present for the Officers to arrest Graham for public intoxication. The questions that remain to be determined by the jury are: (i) whether Graham was intoxicated as defined in section 49.02 of the Texas Penal Code, and (ii) whether he constituted a danger to himself or others. It is undisputed that he was in a public place, as he was a passenger on a DART bus; thus, the court concludes there in no genuine dispute of material fact on this element.

Finally, authority in this Circuit holds that once probable cause exists, the collateral bad or evil motive of the arresting officer is immaterial. *Hunter v. Clardy*, 558 F.2d 290, 292 (5th Cir. 1977). *Clardy* does not apply here, however, because the court has determined that a genuine dispute of material fact remains as to whether the Officers had probable cause to arrest Graham for public intoxication.

---

[13] Whether the discrepancies and inconsistencies in the record are the result of innocent omissions, faulty memory, or other factors is a matter for the jury or trier of fact to determine. The court may not make credibility determinations or weigh the evidence at the summary judgement stage. *Reeves*, 530 U.S. at 150. The jury may choose to believe the Officers at trial, or it may choose to believe Graham.

## ii. Arrest for Assault on a Police Officer

Once facts supporting an arrest are placed before an independent intermediary such as a magistrate or a grand jury, the intermediary's decision breaks the chain of causation for false arrest. *Shields*, 389 F.3d at 150 (citation omitted). A grand jury indictment establishes probably cause. *Gerstein*, 420 U.S. at 117 n.19. It is undisputed that on November 1, 2013, a grand jury indicted Graham on the felony offense of assault on a public servant in case number F13-16626. Defs.' Summ. J. App. 168.

Because a grand jury, an independent intermediary, indicted Graham for assault against a public servant, he must show that Ibarra or Jones tainted the grand jury's deliberations in some way. *See Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988). There is no evidence, however, that either played any role in the indictment process. The record before the court shows that neither of the Officers testified before the grand jury. *See* Defs.' Summ. J. App. 86, 130. Instead, Graham simply alleges that Ibarra tendered false information concerning the charges to the prosecutor, but "mere allegations of 'taint,' without more, are insufficient to overcome summary judgment." *Cuadra*, 626 F.3d at 813 (quoting *Taylor*, 36 F.3d at 457). Probable cause, therefore, existed for Graham's arrest for assault of a public servant.[14]

With regard to his false arrest claims, Graham has failed to raise a genuine dispute of material fact and the court will grant the Officers' motion for summary judgment on this claim.

---

[14] The court rejects the Officers' argument that the grand jury indictment immunizes them from Graham's claim of false arrest with respect to the public intoxication charge. The arrest for public intoxication was already complete and temporally distinct from the arrest on charges of assaulting a police officer. The grand jury indictment for assault of a police officer, therefore, is of no moment with respect to the earlier arrest for public intoxication.

### 4. Malicious Prosecution

Graham's malicious prosecution claim is based on his allegation that Ibarra, who was acting under color of state authority, maliciously charged him with assault on a public servant and tendered false information concerning such charges to the prosecutor, although no probable cause existed. Ibarra and Jones contend that Graham's malicious prosecution claim fails as a matter of law as a result of the holding in *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). They further maintain that they are entitled to summary judgment on Graham's malicious prosecution claim because probable cause existed for his arrest. The court agrees.

Graham does not specifically address the Officers' contention regarding the applicability of *Castellano*. He instead contends as follows:

> [A]though all of the allegations against Graham relating to the Assault on Public Servant charge came after he was arrested, the factual allegations made by Defendants do not meet the elements of the crime. Specifically, to be charged as a felony under Chapter 22 of the Texas Penal Code, the assault must cause bodily injury, otherwise it is a misdemeanor assault, even if the alleged victim is a public servant/ police officer. See, Tex. Penal Code §22.01(a)(1), §22.01(b)(1). Nowhere in the record (including Ibarra's initial report where he lists VIC INJURY as "None") is there any indication or even allegation that Graham injured Jones when he allegedly kicked her. See Exhibit "C" (Page 68-69). As such, Ibarra did not see the "crime" that he claims he saw after Graham was arrested.

Pl.'s Summ. J. Resp. Br. 7. Exhibit C, cited above by Graham, is the DART Incident Report for May 11, 2013, which is also included in Defendants' summary judgment appendix at page 24. This evidence, however, is insufficient to raise a genuine dispute of material fact regarding the probable cause element for malicious prosecution in light of the other evidence submitted by Defendants, including but not limited to the May 12, 2013 supplement to the Incident Report, which details the injury suffered by Ibarra. *See* Defs.' Summ. J. App. 26-32.

Moreover, Graham's malicious prosecution claim is barred by *Castellano*, in which the court held that, standing alone, a claim of malicious prosecution is not a violation of the United States Constitution. *Castellano*, 352 F.3d at 942. Thus, to proceed under section 1983, a malicious prosecution claim must be based on a denial of rights secured under federal law. *Id.* While the "initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection," those claims are for the "lost constitutional rights" and "are not claims for malicious prosecution." *Id.* at 953-54. Graham's malicious prosecution claim is based on his contention that criminal charges for assault were brought against him without probable cause; however, as the court in *Castellano* explained, "causing charges to be filed without probable cause will not without more violate the Constitution." *Id.* at 953. Further, "a freestanding 42 U.S.C. § 1983 claim based solely on malicious prosecution [is] not viable," *Cuadra*, 626 F.3d at 812 (citing *Castellano*, 352 F.3d at 942). Accordingly, as Graham has failed to raise a genuine dispute of material fact to defeat the Officers' motion for summary judgment on his malicious prosecution claim, the court determines that the Officers are entitled to judgment as a matter of law on his malicious prosecution claim and will grant the Officers' motion for summary judgment on this claim.

### 5. Excessive Force

Graham contends the Officers violated his Fourth Amendment rights in the course of arresting him for public intoxication by slamming and holding him to the ground, physically beating him, and choking him. He alleges he was not resisting and that the use of force against him was excessive and objectively unreasonable in violation of the Fourth Amendment. The Officers move for summary judgment based on qualified immunity, arguing that their use of force was justified and

not excessive under the circumstances because Graham resisted them, and that even if their conduct violated Graham's constitutional rights, they acted as objectively reasonable officers.

For the reasons that follow, viewing all facts in the light most reasonable to Graham, the court concludes that, with respect to Jones, as previously stated, the videotape shows conclusively that she did not participate in the use of force during Graham's arrest but stood by and watched as Ibarra subdued Graham. Graham has failed to provide competent summary judgment evidence that contradicts this videotape evidence. Jones did not participate in, direct, or encourage the use of force against Graham. Accordingly, the court concludes that Graham has failed to raise a genuine dispute of material fact as to his excessive force claim against Jones, and the court will grant Jones's motion for summary judgment on his excessive force claim. *See generally Scott v. Harris*, 550 U.S. at 380.

With respect to Ibarra, however, Graham offers summary judgment evidence sufficient to raise a genuine dispute of material fact as to whether Ibarra's use of force during his arrest was objectively unreasonable in light of clearly established law, and Ibarra is, therefore, not entitled to summary judgment based on qualified immunity with respect to Graham's excessive force claim.

### a.     Legal Standard

A plaintiff's claim for excessive force must be determined according to Fourth Amendment standards because "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). Determining whether the force used was reasonable "requires careful attention to the facts

and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396 (citation omitted). The issue of reasonableness centers on whether the officer's actions are "objectively reasonable" in light of the facts and circumstances with which he is faced, without regard to the officer's underlying intent or motivation. *Id*. at 397 (citation omitted). Whether the use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id*. at 396. In applying *Graham*, the Fifth Circuit uses a three-part test that requires a plaintiff to show "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (citation omitted); *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citation omitted). Injury can be one that is physical or psychological. *Ikerd v Blair*, 101 F. 3d 430, 434 n.9 (5th Cir. 1996).

### b. Qualified Immunity

The court will now address whether Graham has raised a genuine dispute of material fact that Ibarra violated his constitutional right to be free from the use of excessive force under the Fourth Amendment, and, if so, whether these rights were clearly established at the time of the encounter, and whether Ibarra acted in an objectively unreasonable fashion under clearly established law.

### i. The Underlying Constitutional Violation

As the first step of the qualified immunity analysis, whether Graham has established the violation of a constitutionally protected right, the court determines that Graham has met his burden

of establishing the three elements necessary for an excessive force claim. *See Graham*, 490 U.S. at 395; *Cooper*, 844 F.3d at 522; *Tarver*, 410 F.3d at 751. The first prong, whether Graham was injured, is not at issue. Ibarra does not dispute at this stage that Graham, as reflected in medical documentation (*see* Pl.'s Summ. J. App. 1-65), suffered numerous injuries following the May 11, 2013 incident.

As to the second prong of establishing his excessive force claim, namely, that the injury resulted directly and only from a use of force that was clearly excessive, while Ibarra denies that the injuries were caused by his conduct, but rather assert the injuries were caused by Graham's own act of losing his balance and falling on the concrete after he pushed off the patrol car while resisting, this is a disputed issue for the trier of fact. Graham's summary judgment evidence adequately establishes that his injuries that day were caused by Ibarra's conduct. *Id.* at 1-65, 71. Further, although Ibarra argues that there was no constitutional violation because the force used was necessary, reasonable and justified to effect the arrest of Graham because he was resisting, *see* Defs.' Summ. J. Br. 14, Graham has provided summary judgment evidence that he did not resist Ibarra and was only kicking because Ibarra was choking him and he could not breathe. While Ibarra's version of how and why he needed to use force would likely not support a finding of excessive force, if accepted by a jury, at the summary judgment stage, the court must view all facts in the light most favorable to Graham, the nonmoving party. Graham has adequately supported his depiction of Ibarra's conduct with his affidavit and medical records, and the court determines from this evidence that he has raised a genuine dispute of material fact as to whether his injuries resulted directly and only from Ibarra's use of force that was clearly excessive. In addition to his affidavit and deposition testimony that he

did not resist arrest, attempt to flee, or pose a risk to Ibarra or anyone else, the hospital records show extensive facial injuries and bruising over his entire face, which is difficult to reconcile with Ibarra's account that Graham's injuries resulted only from his face hitting the sidewalk when he lost his balance and fell.[15] Further, the Incident Report completed by Ibarra on May 11, 2013, at or near the time of the encounter, does not mention any injury to Ibarra, consistent with Graham's statement that he did not bite Ibarra.

With respect to the third factor, that the force used was clearly unreasonable, the *Graham* factors, in addition to showing that the force used was clearly excessive, also show that it was clearly unreasonable. As previously stated, determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). The issue of reasonableness centers on whether the officer's actions are "objectively reasonable" in light of the facts and circumstances with which he or she is faced, without regard to the officer's underlying intent or motivation. *Id*. at 397 (citation omitted).

---

[15] Ibarra contends that the evidence proffered by Graham is insufficient to create a genuine dispute of material fact because he fails to cite to any expert testimony to dispute Oritz's and Spiller's expert opinions that the Officers' use of force was not excessive or objectively unreasonable. *See* Defs.' Reply 8. As previously stated, the expert testimony upon which the Officers rely to defeat summary judgment is unreliable under Rule 702 of the Federal Rules of Evidence and *Daubert*, and will not be considered by the court at this summary judgment phase. Further, Ibarra's reliance on the videotape is of no moment, as the court has concluded that the videotape is too unclear to support either sides' version of the events, except Jones's lack of participation in the use of force, which is evidenced by the videotape.

In this case, the severity of the crime at issue was minimal. The offense of public intoxication is a Class C misdemeanor (Tex. Pen. Code § 49.02(a)), and is punishable "by a fine not to exceed $500." *Id.* § 12.23 (West 2011). Graham did not pose an immediate threat to his own or anyone else's safety (as he was handcuffed), and he has provided testimony that he was not trying to flee or escape police custody and was not resisting. Viewing all facts in the light most favorable to Graham, the court concludes that the force required to inflict the injuries Graham sustained as documented by the hospital records, was clearly unreasonable under the totality of the circumstances.

For these reasons, based on its review of the *Graham* factors, and viewing all evidence in the light most favorable to Graham, the court concludes that Graham has raised a genuine dispute of material fact sufficient to establish that he suffered "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Cooper*, 844 F.3d at 522.

## ii.        *Clearly Established Law/Objectively Unreasonable*

The court's determination that Graham has raised a genuine dispute of material fact that Ibarra used excessive force during his arrest does not end the court's inquiry. The court must determine whether, nevertheless, Ibarra is entitled to qualified immunity because their actions were objectively unreasonable in light of "clearly established law" at the time of the conduct in question.

This second part of the qualified immunity inquiry considers whether the right was clearly established at the time of the violation. "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d

359, 371-72 (5th Cir. 2011) (en banc) (internal quotation marks and citations omitted). "Furthermore, in an obvious case, the *Graham* excessive force factors themselves can clearly establish the answer, even without a body of relevant case law." *Cooper*, 844 F.3d at 524 (internal quotations and citations omitted).

Here, Ibarra does not argue that Graham's right to be free from  the use of excessive force was not clearly established at the time of the incident.  Further, the court determines that the right was clearly established and that case authority on the degree of force an officer may employ was sufficient to provide Ibarra more than fair warning that the amount of force used under the circumstances presented where a suspect was handcuffed, not resisting arrest or attempting to flee, and was being arrested for a Class C misdemeanor, would be objectively unreasonable. "[A]lthough the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, the permissible degree of force depends on [the *Graham* factors]." *Cooper*, 844 F.3d at 524-25 (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (internal quotation marks omitted)).  In *Bush*, the Fifth Circuit held that it was objectively unreasonable for an officer to slam an arrestee's face into the nearby vehicle when the arrestee "was not resisting arrest or attempting to flee." *See also Newman v. Guidry*, 703 F.3d 757, 762 (5th Cir. 2012) (holding that tasing an arrestee was objectively unreasonable when "[t]he videos [did] not show Newman attempting to strike either officer, holding a weapon, or even trying to reach for his waistband[.]").

In this case, accepting Graham's version of the facts, which finds support in the summary judgment record, Graham was not attempting to flee or resist arrest, and Ibarra had no reason to think

he posed an immediate threat, as he was handcuffed.  He was charged with public intoxication, a misdemeanor offence.  While it is undisputed that Graham was kicking his legs, viewed in the light most favorable to him, the court must view as true that he was kicking in response to being choked by Ibarra, and not as a form of resistance to arrest.  Further, that *Newman* involved a taser, rather than fists, does not shield Ibarra from liability.  As stated in *Newman*, "[l]awfulness of force . . . does not depend on the precise instrument used to apply it.  Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel." *Id.* at 763-74 (footnotes omitted).  In short, genuine disputes of material fact exist regarding whether Ibarra did, in fact, engage in conduct that was objectively unreasonable under clearly established law.

Although the trier of fact might ultimately conclude that qualified immunity is warranted because reasonable officers could disagree about whether Ibarra's conduct was reasonable under the circumstances, the court may not make this decision at the summary judgment stage, as such decision necessarily involves credibility assessments.  Any credibility determination made between Ibarra's and Graham's version of the events is inappropriate for the court to make at the summary judgment stage.  *Reeves*, 530 U.S. at 150.  Based on Graham's version, there are genuine disputes of material fact as to whether Ibarra's conduct was objectively unreasonable with respect to the use of force.

This case is unusual in that both parties have submitted the same videotape in support of their respective arguments concerning Graham's excessive force claim, and both parties contend it is consistent with their respective accounts of what transpired from the time the Officers escorted a handcuffed Graham from the bus to the patrol car until the time EMS arrived at the scene to administer aid several minutes later.  As already noted, the videotape shows that Jones was a

bystander to the arrest and did not participate in the use of force.  With regard to Ibarra, however, the disputed facts during this time period control the outcome of Graham's excessive force claim against him.  Otherwise stated, the resolution of the disputed facts determines whether Ibarra used only the force needed to hold down and subdue Graham, who was allegedly resisting and out of control, and a danger to the safety of Ibarra and others; or whether Ibarra threw Graham to the ground while he was handcuffed, pinned him down for an extended period, choked him, and beat him to such an extent that he suffered injuries severe enough that the Dallas County Jail would not accept him for booking, even though Graham was not actively resisting or attempting to evade arrest by flight.  As previously stated, the videotape is too unclear to substantiate either scenario, and the court is relegated to the paper record, except insofar as the videotape shows Jones as a bystander. With respect to the paper record, the court has already concluded that the expert testimony of Ortiz and Spiller, upon which the Officers rely to support their entitlement to summary judgment, is not reliable under Rule 702 of the Federal Rules of Evidence and *Daubert*.

At the summary judgment stage of the case, the court may not "make findings of fact from disputed evidence." *Chacon v. Copeland*, 577 F. App'x 355, 360 (5th Cir. 2014).  Whether the Officers' conduct was objectively unreasonable requires credibility assessments by the trier of fact, and is thus not appropriate for the court to resolve on summary judgment.  *Reeves*, 530 U.S. at 150.

On the record before it, the court, therefore, determines that Graham has presented sufficient summary judgment evidence to raise a genuine dispute of material fact as to whether Ibarra's use of force violated the Fourth Amendment and whether he acted in an objectively unreasonable fashion

under clearly established law. Accordingly, the court will deny Ibarra's motion for summary judgment on Graham's excessive force claim.

### 6. Bystander Liability (Failure to Intervene)

Graham, in conclusory fashion, alleges that Ibarra and Jones are liable under section 1983 for "failing to intervene, where such intervention would have prevented the [alleged constitutional] violations and/or injuries of Plaintiff[.]" Pl.'s Compl. ¶ 22(b). He makes no other allegations to support this claim. "[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

Ibarra and Jones contend that they are entitled to summary judgment on this claim because, among other things, Graham fails to present any evidence to support his failure-to-intervene or bystander claim, and, accordingly, he has failed to raise a genuine dispute of material fact on this claim sufficient to overcome the Officers' defense of qualified immunity. *See* Defs.' Summ. J. Br. 21. The court agrees.

In his response, Graham fails to address this claim, much less respond to any of the arguments raised by Ibarra and Jones in support of their motion for summary judgment on this claim. Although Graham's failure to respond does not permit the court to enter a "default" summary judgment on his section 1983 bystander liability claim against the Officers, the court is permitted to accept the Officers' evidence as undisputed. *Bookman*, 945 F. Supp. at 1002. Further, a summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence." *Id.* (citing *Solo Serve Corp.*, 929 F.2d at

165); *see also Larry*, 929 F.2d at 211 n.12 ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence."). As Graham's Complaint is not verified, the court may not consider it in determining whether he has raised a genuine dispute of material fact sufficient to overcome the Officers' qualified immunity.

Having considered the summary judgment evidence provided by the Officers, and pursuant to Federal Rule of Civil Procedure 56(e), the Officers' motion for summary judgment on Graham's failure-to-intervene claim must be granted because he has failed to provide even a scintilla of evidence to support his claim. By not responding to the Officers' arguments and submitting any evidence in support of his section 1983 failure-to-intervene claim against the Officers, Graham has failed to raise a genuine dispute of material fact as to the Officers' contentions and undisputed evidence supporting their motion for summary judgment, and the Officers are entitled to judgment as a matter of law. Accordingly, the court will grant Ibarra's and Jones's motion for summary judgment on Graham's failure-to-intervene claim and enter judgment in their favor regarding this claim against them.

Alternatively, the court concludes that Graham has abandoned or waived his section 1983 failure-to-intervene claim against the Officers. As previously noted, when a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Black*, 461 F.3d at 588 n.1; *Keenan*, 290 F.3d at 262. As Graham failed to pursue his failure-to-intervene claim against the Officers, this claim is no longer before the court, and he has abandoned or waived it. Accordingly, in addition to the reasons set forth previously, Graham's abandonment

or waiver constitutes an alternative ground for granting summary judgment in the Officers' favor on his failure-to-intervene claim.

### C. State Law Claims Against Ibarra and Jones

Graham has alleged state law claims for IIED, false arrest and imprisonment, and assault and battery against Ibarra and Jones. Ibarra and Jones contend they are entitled to judgment on these claims under the Texas Tort Claims Act ("TTCA") because it is undisputed that, on the date in question, they were employed by DART, a governmental entity for purposes of the TTCA, and "on-duty, in police uniform." Defs.' Summ. J. Br. 25. Ibarra and Jones further assert that they have demonstrated that the assault, if any, occurred within the scope of their employment. They contend, therefore, that they are entitled to dismissal under the TTCA of Graham's state law claims because he could have brought his state claims against DART. For support, they cite section 101.106 of the TTCA. Ibarra and Jones contend that, if Graham now maintains that his state law claims are against DART, they still fail because the TTCA does not apply to intentional torts.

In response, Graham contends: "The state law claims against Jones and Ibarra arise from the misuse of tangible personal property, to wit, OC spray, which they admit that they used in the false arrest and subsequent unlawful and savage beating of [him]." Pl.'s Summ. J. Resp. Br. 9.

"[A] suit against a government employee in his official capacity is a suit against his [or her] government employer," whereas, "a suit against an employee in his [or her] individual capacity is a suit seeking personal liability." *Alexander v. Walker*, 435 S.W.3d 789, 791 (Tex. 2014) (internal quotations marks omitted). Under the TTCA, "an employee is considered to have been sued in his official capacity when the suit (1) is based on conduct within the general scope of his employment,

and (2) could have been brought under the TTCA against the government." *Stinson v. Fontenot*, 435 S.W.3d 793, 794 (Tex. 2014) (per curiam). Section 101.106(f) of the TTCA "is the appropriate avenue for dismissing a government employee considered to have been sued in his [or her] official capacity." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 101.106(f)). On the employee's motion, section 101.106(f) requires dismissal of the suit against the employee unless the plaintiff "files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed." *Alexander*, 435 S.W.3d at 791 (quoting § 101.106(f)).

Graham does not dispute Ibarra's and Jones's contention or evidence that his state law tort claims against them are based on conduct within the general scope of their employment with DART. Further, these claims could have been brought under the TTCA against DART. *See Franka v. Velasquez*, 332 S.W.3d 367, 379-80 (Tex. 2011) (holding that, barring an independent statutory waiver of immunity, tort claims against the government are brought under the TTCA for section 101.106(f) purposes even when the TTCA does not waive immunity for those claims). Consequently, Ibarra and Jones are considered to have been sued in their official capacity only, notwithstanding Graham's allegation in his Complaint that his state law claims are against Ibarra and Jones in their individual capacity. Ibarra and Jones are, therefore, entitled to summary judgment on Graham's state law tort claims under section 101.106(f) of the TTCA because Graham did not amend his pleadings to substitute DART with respect to his state tort claims within 30 days of Ibarra and Jones moving for summary judgment based on section 101.106(f) of the TTCA.

Although the deadline for pleading amendments had expired by the time Ibarra and Jones moved for summary judgment on this ground, Graham was on notice as early as December 30, 2014, that they contended they were entitled to dismissal under 101.106(f) of the TTCA.  *See* Defs.' Answer 5 (Doc. 6).  At no time before or after the pleading amendment deadline or after Ibarra and Jones moved for summary judgment did Graham seek leave to amend his pleadings to substitute DART or even address their argument regarding the applicability of section 101.106(f) of the TTCA.

Further, even if DART had been substituted for Ibarra and Jones, Graham's state law tort claims would still be barred.  The TTCA "waives immunity for injuries caused by the negligent use of tangible property." *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014).  This limited waiver, however, does not apply to intentional torts, including claims "arising out of assault, battery, false imprisonment, or any other intentional tort." *Id.*; Tex. Civ. Prac. & Rem. Code § 101.057(2).  Thus, to sue a governmental entity under the TTCA's limited waiver, "a plaintiff may allege an injury caused by negligently using tangible personal property, . . . but to be viable, the claim cannot arise out of an intentional tort." *City of Watauga*, 434 S.W.3d at 589 (internal citations omitted).

Graham's state law claims constitute intentional torts that fall within the exclusionary provision of section 101.057(2) of the TTCA.  His  claim for assault and battery is an intentional tort under section 101.057(2) of the TTCA.  Likewise, IIED and false imprisonment are both intentional torts under Texas state law. *See Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 16 n.3 (Tex. 2008) (setting forth the elements of IIED and false imprisonment, both of which require intentional or wilful conduct).  Moreover, negligent infliction of emotional distress is not recognized as a viable claim under Texas law. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).

Graham's contention that his state law claims arise from the officers' "misuse of . . . OC spray, which they admit that they used in the false arrest and subsequent unlawful and savage beating of [him][,]" *see* Pl.'s Summ. J. Resp. Br. 9, does not change the court's conclusion that his state law claims are intentional torts that are barred by the TTCA. *See City of Waco v. Williams*, 209 S.W.3d 216, 223 (Tex. App.—Waco 2006, pet. denied) (concluding that excessive force allegations based on the use of a taser was an intentional tort claim); *City of Garland v. Rivera*, 146 S.W.3d 334, 338 (Tex. App.—Dallas 2004, no pet.) (concluding that claim based on officers' use of pepper spray, handcuffs, and a K-9 police dog and "other departmentally issued property" in making an arrest was an intentional tort claim for purposes of the TTCA).

Moreover, Texas courts have consistently held that claims based on factual allegations of intentional conduct cannot be masked as negligence claims to circumvent the intentional tort exclusion of the TTCA. *Williams*, 209 S.W.3d at 222; *Harris Cty. v. Cabazos*, 177 S.W.3d 105, 110 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The intentional tort exclusion of the TTCA would thus apply, and Graham's tort claims would not be viable under Texas law, even had DART been substituted for Ibarra and Jones as the responsible defendant.

Accordingly, for all of these reasons, the court determines that Graham has failed to raise a genuine dispute of material fact as to the Officers' motion for summary judgment on his state law claims, and the Officers are entitled to judgment as a matter of law on these claims. Accordingly, the court will grant Ibarra's and Jones's motion for summary judgment on Graham's state law claims and enter judgment in their favor regarding his state law claims against them.

## IV. Conclusion

For the reasons herein stated, Defendants' Motion for Summary Judgment (Doc. 15) is **granted in part** and **denied in part**. Defendants' Motion for Summary Judgment is **granted** with respect to:

(1)     Graham's federal and state law claims against DART;

(2)     Graham's federal claims, brought pursuant to section 1983, against Ibarra and Jones for: (i) malicious prosecution; (ii) bystander liability; (iii) violations of the First Amendment (iv) violations of the Fifth Amendment; and (v) conspiracy;

(3)     Graham's federal claim, brought pursuant to section 1983, against Jones for excessive force in violation of the Fourth Amendment; and

(3)     Graham's state law claims against Ibarra and Jones.

As Graham has failed to raise a genuine dispute of material fact with respect to the above-listed federal and state law claims, these claims are **dismissed with prejudice**.

As genuine disputes of material fact remain for trial, Defendants' Motion for Summary Judgment is **denied** with respect to Graham's section 1983 claims against Ibarra and Jones for violating the Fourth Amendment by: (i) unlawfully detaining him for disorderly conduct; and (ii) arresting him for public intoxication without probable cause; and **denied** with respect to Graham's section 1983 claims against Ibarra for violating the Fourth Amendment by using clearly and unreasonably excessive force during the arrest for public intoxication. Accordingly, these claims remain for trial. The court will reset the trial of this case and pretrial deadlines by separate order.

**It is so ordered** this 28th day of December, 2017.

Sam A. Lindsay
United States District Judge